# EASTERN EXTENSION, AUSTRALASIA & CHINA TELEGRAPH COMPANY, LIMITED, *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 357.   Argued December 15, 1919.—Decided January 12, 1920.

The Court of Claims is without jurisdiction of a claim based on an obligation of the United States growing directly out of the treaty with Spain ceding the Philippine Islands or on one imposed by principles of international law as a consequence of the cession. Pp. 357, 362. *Eastern Extension Tel. Co.* v. *United States*, 231 U. S. 326; Jud. Code, § 153.

To create an express or, (in a strict sense,) an implied contract binding the United States, some officer with express or implied power to commit the Government must have intended that result. P. 363.

A cable company holding Spanish concessions in the Philippines obliging it to transmit government messages, in part free and in part at reduced rates, and to pay certain taxes, and entitling it to a subsidy, claimed the subsidy from the United States, upon the ground that the Government, by accepting the benefits, had assumed the burdens of the concessions. *Held*, that no such contract could be derived from the facts as found. *Id.*

Such a contract could not be implied from the use of the cable service in transmitting government messages, when the Government paid

the rates, in part reduced but all as fixed and charged by the company, and, through the Secretary of War, expressly declined free service. P. 363.

Nor did any liability of the United States arise from expenditures made by the company in voluntarily extending its lines with approval of the Government given without prejudice to the Government's rights. P. 364.

The acceptance by subordinate executive officials of the Insular Government of payments tendered by the cable company in connection with statements of account assuming a recognition of its concessions and right to subsidy, *held* no basis for implying an obligation of the United States to pay the subsidy. *Id.*

54 Ct. Clms. 108, affirmed.

THE case is stated in the opinion.

*Mr. Louis Marshall* for appellant.

*Mr. Assistant Attorney General Davis*, with whom *Mr. W. F. Norris* was on the brief, for the United States.

MR. JUSTICE CLARKE delivered the opinion of the court.

The appellant, claimant, is the grantee from the Government of Spain of three concessions to lay down and operate submarine cables. The first one, in 1879, was for the exclusive privilege, for forty years, of constructing and operating a cable between the Island of Luzon and Hongkong. It was landed at Bolinao, on the northerly coast of Luzon, and dispatches were transmitted to Manila and other places by government owned land lines, which were subject to interruption. This concession required that official messages be transmitted free and be given precedence. In 1898 a second concession, supplemental to the first, empowered the claimant to extend its cable to Manila and the term of the prior exclusive grant was extended twenty years, with the same priority for official dispatches, but with the provision that they were to be

transmitted free, only for the first ten years from the date of this second grant.

In 1897 a third concession, the one with which this case is chiefly concerned, authorized the claimant to lay down and operate three submarine cables, connecting the Island of Luzon with three Visayas Islands,—Panay, Negros and Cebu. This grant required the claimant: to operate the cables for twenty years; to give precedence to official dispatches and to charge for them at one-half the rates charged for private messages; to pay a tax of ten per cent. on receipts in excess of expenses not to exceed £6,000 per annum, an additional tax of "fifty centimes of a franc" per word on telegrams transmitted, and a surtax of "five centimes of a franc" per word on telegrams between the four islands named in the grant and others of the Archipelago.

The Government of Spain, on its part, agreed to pay the claimant, in equal monthly instalments, an annual subsidy of £4,500 during the term of the grant.

All of the cables were promptly laid down and put in use and those of the third grant are designated in the record as the "Visayas cables," and the grant as the "Visayas concession." This suit is to recover the amount of the subsidy provided for in the third concession, which had accrued when the petition was filed.

The United States denied all liability, and the judgment of the Court of Claims, dismissing the petition, is before us for review.

The case was here before on appeal and this court held (231 U. S. 326) that the case as then stated in the petition, was not within the jurisdiction of the Court of Claims, whether viewed as asserting an obligation growing directly out of the treaty with Spain or one imposed by principles of international law upon the United States as a consequence of the cession of the Islands by the Treaty. The court, however, referring to certain general and indefinite

allegations in the petition, suggested that the implication might be drawn from them that there may have been action on the part of officials of .the Government of the United States since it had assumed sovereignty over the Islands, which, if properly pleaded and proved, would give rise to an implied contract with the claimant outside the Treaty, which would be within the jurisdiction of the Court of Claims, and, to the end that the right to have such a claim adjudicated might be saved, if it really existed, the case was remanded for further proceedings in conformity with the opinion.

Doubtless inspired by the suggestion from the court, an amended petition was filed, in which claimant alleged with much detail; that the Government of the United States had used the cables extensively for official messages, which had been given precedence and had been trans- mitted, as required by the terms of the two concesssions, over the Hongkong cable free until 1908 and thereafter at one-fourth of the regular rate, and over the Visayas cables at one-half the rate charged for private dispatches; that the claimant had paid and the Government accepted the ten per cent. tax on receipts from messages, computed as required by the third concession; that since the American occupation the service over the Visayas cables had been extended and improved at large expense by arrangements with duly authorized officers of the Govern- ment; and that in August, 1905, the claimant had paid and the Government had accepted a balance due on an account stated in a form indicating an adoption of the terms of 'the concessions. By this course of conduct, it was averred, the United States "assumed and adopted" all of the obligations imposed on the Government of Spain by the concessions, and agreed with the claimant to discharge and perform all of them and especially agreed to pay the annual subsidy of £4,500, as required by Art. 10 of the third concession.

Trial by the Court of Claims resulted in findings of fact, as follows: That the concessions were made to claimant as alleged and that all of the cables were completed and in use when the Treaty with Spain was signed, December 10, 1898; that the Government used the cables extensively for official dispatches which were given priority in transmission, but that this was in accordance with the International Telegraph Convention, as well as in compliance with the terms of the concessions; that the claimant charged the Government for messages over the Visayas cables at one-half the rate charged for private dispatches, which is the rate prescribed by the third concession, but that it "has paid the full rates charged by the claimant for messages over any of the lines" and claimant had authority to make its own rates; and that it is not true that the claimant transmitted messages over the Hongkong cable free of charge—"The United States Government has paid full established rates on the Hongkong-Manila cable."

It is further found that since December, 1901, the claimant has made claim to the subsidy in annual statements to the authorities of the Philippine Government, in which the terms of the concession granting it were referred to and in which the United States was charged with the amount of it then accrued. With respect to these, except as hereinafter noted, the court finds that whether any reply was made to them "does not appear from the record."

Much significance is attached by the claimant to the statement presented on June 11, 1905. The finding with respect to this is that on that date the claimant's representative forwarded to "The Secretary of Finance and Justice," an officer of the Philippine Government at Manila, a communication, with an attached statement, purporting to show the amount "due to the United States Government in the Philippines on account of the transmission

of all United States Government traffic over the Manila-Hongkong cable, as per the concession granted us for the laying of the same, up to and including December 31, 1904."

In this statement the Government is credited (as if the amount had not been paid) with what it had paid for service over the Hongkong-Manila cable, laid under the first and second concessions, from August 21, 1898, to December 31, 1904, and it is charged with "Visayas subsidy," under the third concession, £4,500 per annum to December, 1904. Thus a balance was arrived at of £4,712.10.6 in favor of the United States, as to the disposal of which "I shall be glad to receive your instructions," wrote the representative of the claimant.

In reply to this the Auditor of the Government of the Philippine Islands, to whom it had been referred, wrote to claimant's representative at Manila, acknowledging receipt of his letter in which it was stated "there is due the *Insular Government* under your concession the sum of £4,712.10.6" and the Auditor added "It is respectfully requested that said amount be deposited with the Insular Treasurer as miscellaneous revenue." Payment was made and receipt given by the Treasurer of the Government of the Philippine Islands for the amount as "due Government as per statement of account rendered by Eastern Extension, etc., Telegraph Co. to Secretary, Finance & Justice June 11, 1905."

Each year after 1905 the claimant sent a statement to the "Secretary of Finance and Justice" at Manila in the form following: "The United States Government at Manila in account with the Eastern Extension, Australasia and China Telegraph Co., Limited. . . . Free transmission of American Government Telegrams over Hongkong-Manila Section." Then follow credits for messages passing over the Hongkong-Manila cable, as if they had not been paid for, and a debit of the "Visayas

subsidy" accrued to the date of the statement.    To these
no reply appears to have been made.

It is expressly found that:

"Except the payment above referred to in 1905, the
claimant has never paid anything into the treasury of
the Philippine Government.    It does not appear that
any part of said sum was paid into the Treasury of the
United States.    Nor has the claimant paid any sum to
the United States Government."

The only payment of the ten per cent. tax under the
third concession was that made in 1905, £184.17.2, and
the statement showing this balance in favor of the United
States concluded:

"I therefore have the honor to request that the nec-
essary permission be given to the Treasurer to receive
these amounts, now standing to the credit of the United
States Government in the Philippines."

Of its own motion the claimant, in 1899, made exten-
sions of the Visayas cables at a considerable expense.
But the finding with respect to this is:

"These extensions were carried out with the approval
of the military authorities in control of the Philippines
at that time, and by the sanction of the United States
Government, but without prejudice to, and with the
reservation of, all rights of the Government of the United
States."

The following is from the court's finding of fact No. IX:

"Between the 10th day of December, 1898, and March,
1899, considerable correspondence was exchanged be-
tween the Government of the United States and the
claimant regarding the transmission of official telegrams
over the Hongkong-Manila cable at reduced rates.

"On the 1st of March, 1899, the Secretary of War
transmitted to the chairman of the claimant company
a telegram, stating that the War Department 'accepts
the courteous offer of your company to transmit messages

free between Hongkong and Manila, providing that this acceptance leaves in abeyance Spanish concession which is now under consideration.' On the following day the claimant's reply was transmitted to the War Department, stating that the foregoing telegram had been received and the reservation therein noted, and that 'the company have pleasure in affording all possible facilities to the United States Government in connection with the transmission of their telegrams.' On the 28th of March, 1899, a written communication was transmitted by the War Department to the duly authorized representative of the claimant company, to the effect that 'upon careful reconsideration of the subject it is deemed inadvisible for the department to avail itself of your company's offer. I beg to state, therefore, that the department will pay the established rates on official cable messages, and all accounts of this character presented to the United States will be paid.' This communication concluded with a renewal of thanks 'for the voluntary reduction in rates which your company has so courteously tendered.' The United States Government has paid full established rates on the Hongkong-Manila cable, and has paid the established rates on the Visayas cables on its messages."

Upon these findings of fact and upon principles and analogies derived from the law of private contract, the court must proceed to judgment. For it was determined by this court on the former appeal, that any right in the defendant derived directly from the Treaty with Spain, or any obligation imposed upon the United States by principles of international law as a consequence of the cession of the Islands, would not be within the jurisdiction of the Court of Claims, and counsel for claimant, expressly disclaiming the assertion of any right under the Treaty of Paris, urge that the case be treated exactly as it would be if it arose between two private citizens.

So regarding the case. It is obvious that no express contract by the United States to adopt and be bound by the third or any of the concessions can be made out from the findings of fact, and it is equally clear that such an implied contract, using the words in any strict sense, cannot be derived from the findings, for it is plain that there is nothing in them tending to show that any official with power, express or implied, to commit that Government to such a contract ever intended to so commit it.

The contention of the claimant must be sustained, if at all, as a quasi-contract,—as an obligation imposed by law independent of intention on the part of any officials to bind the Government,—one which in equity and good conscience the Government should discharge because of the conduct of its representatives in dealing with the subject-matter.

It is argued that the United States should be held to have assumed the burden of the concession because it derived benefits and advantages from the use of the cables.

These cables were in operation when the United States Government assumed jurisdiction over the Islands. It extended a much more efficient governmental protection over the lines than they had before, but left the claimant in full ownership and control over them with the power to determine rates for service. The Government, to be sure, availed itself of the advantages of communication which the cables afforded, but for such service it paid the rates which the claimant demanded and which it must be assumed were adequate. From such circumstances as these, very clearly, the law will not raise an obligation on the part of the Government to assume the burden of the subsidy on the principle of undue enrichment or of advantage obtained. It used the cables as other customers used them and from such a use, paid

for at the full rate demanded, no obligation can be derived by implication.

It is further contended that the terms and conditions of the concession should be imposed on the Government because the officials of the Philippine Government accepted taxes computed as provided for by the third grant.

The finding of the Court of Claims is not that the Philippine Government demanded or exacted the small amount of taxes that was paid, but that the claimant itself computed the amount in the manner which it thought was provided for in the concession and tendered payment, which, after repeated urging, was accepted by local officers of the Philippine Government, so subordinate in character that it is impossible to consider them as empowered to commit the Government of the United States to the large responsibilities now claimed to spring from their conduct.

The finding with respect to extension of the cables in 1899 excludes all suggestion of the assumption of any liability by the United States on account of the expenditure involved.

The form of the statement of account of December 31, 1904, showing a balance favorable to the United States, which was paid to and accepted by the Treasurer of the Philippine Government, and from which so much is claimed, is not impressive as creating the asserted liability.

Here again the claimant, without suggestion of demand from the Government of the United States or even from the Philippine Government, prepared a statement and, in order to give it the form of an account, was obliged to treat as unpaid, charges for tolls over the Hongkong-Manila cable all of which had been paid by the United States Government and accepted by the claimant.

A separate government, sustained by its own revenues, has been maintained for the Philippine Islands ever since they were ceded to the United States. At first military,

it became a civil government in 1902, organized as provided for by an act of Congress (32 Stat. 691, c. 1369), with a Governor General, and executive, legislative and judicial departments, all subject to the supervision of the Secretary of War of the United States.

It is surprising that the claimant, when it desired to have these important concessions, with their large obligations, adopted by the Government of the United States, did not make application for that purpose directly to that Government or to its Secretary of War, or at least to the Governor General or legislative department of the Philippine Government, instead of relying for its adoption by implication, as it has done, chiefly upon the form in which the accounts were presented to the Secretary of Finance and Justice of the Philippine Government.

The action of a department head of the Philippine Government, (inconsistent with the position taken by the Secretary of War in 1899, with respect to the subject-matter) in accepting a voluntary payment of $23,000 cannot be made the sufficient basis for implying an obligation on the part of the Government of the United States to pay a bonus of a total aggregate of almost $440,000.

If doubt could be entertained as to the correctness of this conclusion it would be disposed of by the fact that when the claimant, in March, 1899, tendered to the Secretary of War, so far as appears the only official of the United States with large powers, who considered the subject, the privilege of free transmission of messages over its Hongkong-Manila cable, as was provided for in the first concession, the offer was politely but firmly declined, with the statement that "the department will pay the established rates on official cable messages, and all accounts of this character presented to the United States will be paid,"—a promise which the findings show that he and his successors in office have faithfully kept.

In the jurisdiction given to the Court of Claims Con-

gress has consented that contracts, express or implied, may be judicially enforced against the Government of the United States. But such a liability can be created only by some officer of the Government lawfully invested with power to make such contracts or to perform acts from which they may be lawfully implied. *Langford* v. *United States*, 101 U. S. 341, 345; *United States* v. *Buffalo Pitts Co.*, 234 U. S. 228; *Tempel* v. *United States*, 248 U. S. 121; *Ball Engineering Co.* v. *J. G. White & Co.*, 250 U. S. 55.

The foregoing discussion makes it palpably plain that no contract, express or implied, to pay the disputed subsidy, was made by any officer of the United States, and the judgment of the Court of Claims is therefore

*Affirmed.*